IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>MEDLAB, INC., et al.,<br><br>    Defendants. | No. C 08-822 SI<br><br>**ORDER GRANTING PLAINTIFF'S<br>MOTION FOR SUMMARY JUDGMENT** |

On March 27, 2009, the Court heard oral argument on plaintiff's motion for summary judgment. Having considered the arguments of the parties and the papers submitted, and for good cause shown, plaintiff's motion for summary judgment is GRANTED.

**BACKGROUND**

Plaintiff, the Federal Trade Commission ("FTC"), brings this action against defendants Medlab, Inc.; Pinnacle Holdings, Inc.; Metabolic Research Associates, Inc.; USA Health, Inc.; and Scott Holmes. In its complaint, filed February 6, 2008, the FTC alleges that defendants violated sections 5(a) and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 52, by representing in their advertisements that:

    a.    Defendants' Weight Loss Product causes users to lose substantial amounts of weight rapidly, including as much as 15 to 18 pounds per week and as much as 50% of all excess weight in just 14 days, without dieting or exercising.
    b.    Defendants' Weight Loss Product causes permanent or long-term weight loss.
    c.    Clinical studies prove that Defendants' Weight Loss Product causes users to lose substantial amounts of weight rapidly, including as much as 15 to 18 pounds per week and 50% of all excess weight in just 14 days, without dieting or exercising.

Complaint ¶ 17.

**1.     The Defendants**

The corporate defendants are closely held Georgia corporations. Answer ¶¶ 6-9. [Docket No. 14] Medlab, Inc.; Metabolic Research Associates, Inc.; and U.S.A. Health, Inc. marketed and distributed the weight loss product at issue here under the names Zyladex, Questral AC, and Rapid Loss. *See* Decl. of Raminder Sabhi in Supp. of Pl. Mot. for Summ. J. ("Sabhi Decl."), ex. 29 ¶¶ 19-21. Each of these defendant companies was run by defendant Scott Holmes. *Id*. ¶¶ 126-27. They had no employees. *Id.*, ex. 30 ¶1; *see also* Decl. of Evan Rose in Supp. of Pl. Mot. for Summ. J. ("Rose Decl.), ex. 4 ¶1 & ex. 5 ¶ 1. Holmes founded defendant Pinnacle Holdings, Inc. to supply services to the other defendant companies. Shabhi Decl., ex. 32 (Holmes Depo.), Tr. 52:18-24. These services included hiring graphic artists to lay out the advertisements at issue in this case and placing the advertisements in newspapers. *Id.*, Tr. 54:10-55:22.

Holmes has manufactured and marketed dietary supplements for weight loss since the 1990s. Sabhi Decl., ex. 32 (Holmes Depo.), Tr. 11:23-12:19. Once the marketing became ineffective for a particular product, he would form a new company to market a new product. *Id.*, 15:20-23; 20:10-21; 22:14-16; 25:23-24; 35:5-8. He is president of each of the corporate defendants in this case and was responsible for their operations, including placing advertisements and substantiating the claims made in advertisements for the product at issue here. *Id.*, ex. 29 ¶¶ 146-47. He researched the product ingredients, wrote the advertisements, and composed the scripts used by the companies that received orders. *Id.* ¶ 143; ex. 32, Tr. 42:17-19 & 161:15-21.

**2.     The Advertisements**

Between August of 2005 and May of 2006, defendants' advertisements appeared in Sunday newspaper supplements distributed by Valassis Communications. *See* Sabhi Decl. ¶ 4 & exs. 1-28. Beginning in January of 2007, the advertisements appeared in newspaper supplements distributed by News America Marketing FSI, Inc. *Id.*, exs. 28 & 47. The advertisements appeared in newspapers throughout the United States, including the San Francisco *Chronicle*. *Id.* ¶ 8 & ex. 31.

One advertisement promotes "The New Skinny Pill" in large, red font.[1] Sabhi Decl., ex. 1. This heading is followed with the sentence, "*Lose up to 15 pounds a week with the amazing formula that forces your body to release fat!*" which also appears large, bold font. The body of the advertisement states:

> Clinical studies prove it. You will see and feel immediate results . . . starting the very first day! In fact, the Zyladex Plus doctor designed therapy works so fast you can actually LOSE as much as 50% OF YOUR EXCESS WEIGHT IN JUST 2 WEEKS and continue to trim away unwanted pounds and inches at such a staggering rate that **Not Even Total Starvation Can Slim You Down and Firm You Up This Fast – This Safe!**[2]

The advertisement advises readers that they will follow a "three-step plan." The first step is to ingest the product. This is followed by "Step #2: You Eat – Miss No Meals – Enjoy all sorts of food morning, noon and night as this scientific design creates a NON-STOP HIGH LEVEL OF FAT BURN OFF ALL DAY LONG so pounds and inches vanish like never before." The third step involves watching one's excess weight "melt away." The advertisement advises readers that "this is THE LAST WEIGHT REDUCING AD YOU WILL EVER HAVE TO READ." In addition, readers are informed that one can "Lose All Your Unwanted Weight and Keep It Off or Your Money Back." Readers are told that they "have only pounds and inches to lose and a lifetime of slimness to gain."

### 3. Expert Testimony

Edward R. Blonz prepared an expert report for the FTC in this matter. *See* Rose Decl., ex. 1000. Blonz concludes that there is "no scientific basis whatsoever" to support the three representations challenged in the FTC's complaint. *Id.* ¶¶ 3-6. In particular, Blonz explains:

> The loss of one pound of body fat requires an energy deficit of approximately 3,500 calories. The average adult ingests 2000-2500 calories per day with some variance according to sex, weight and physical activity level. (i) A low calorie diet will be considered to be one where the normal caloric intake is reduced by 500 to 1,000 per day. Such an energy deficit should result in a weight loss of approximately 1 to 2 pounds per week (0.14 to 0.29 pounds per day). . . . (iii) Even under the conditions of a complete starvation fast – where no calories are consumed – the reported loss of body weight over

---

[1] The advertisements are similar, but not identical. The Court describes the advertisement in Sabhi Decl., ex. 1 as being representative. A copy of this exhibit is attached to this order.

[2] Where possible, the Court has preserved the original appearance of the font.

3

the long term will occur at a rate of only 0.66 pounds per day. An explanation is that the human body adapts to caloric deprivation and becomes more conservative in how it uses energy.

*Id.* ¶ 14(e).

Applying these principles, Blonz opines that in order for a weight loss product to cause a loss of body weight of 15 to 18 pounds per week, "there would need to be a caloric deficit of between 7,500 and 9,000 calories per day." *Id.* ¶ 32(c). To bring about this result, "a 200 pound individual would need to run between 57 and 68 miles every day . . . . This distance translates to running in excess of a double marathon every day." *Id.* ¶ 32(d). Noting that defendants' product purports to create weight loss without dieting or exercising, Block concludes, "[a]ny suggestion that the use of [defendants' product] can bring about a caloric deficit between 7,500 and 9,000 calories per day is clearly outside the realm of plausible science." *Id.* ¶ 32(f).

Blonz determined that the active ingredients in defendants' product are Citrus Aurantium, caffeine, and green tea. He examined the scientific literature on each of these ingredients and concluded that there is "little evidence to support the use of citrus aurantium for weight loss in humans," *id.* ¶ 18(c), "no evidence that the intake of caffeine [in defendants' product] would give rise to any significant increase in caloric expenditure," *id.* ¶ 19(e), and "no evidence in the scientific literature that the intake of the Green Tea extract provided by taking [defendants' product] would be associated with any weight loss," *id.* ¶ 20(c).

**LEGAL STANDARD**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *See id.* at 325.

4

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id*. The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**1.    FTCA Violation**

The FTC contends that there are no triable issues as to whether defendants violated sections 5(a) and 12 of the Federal Trade Commission Act. Section 5(a) of the FTCA provides, in relevant part:

> (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.
> (2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.
> . . .
> (4)(A) For purposes of . . . this section, the term "unfair or deceptive acts or practices" includes such acts or practices involving foreign commerce that –
>     (i) cause or are likely to cause reasonably foreseeable injury within the United States; or
>     (ii) involve material conduct occurring within the United States.

15 U.S.C. § 45(a). Section 12 proscribes the dissemination of false advertising "for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase . . . of food, drugs, devices,

services, or cosmetics." 15 U.S.C. § 52.[3] The FTC must prove "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001). In determining whether defendants made a particular representation, the Court may consider the "net impression" created by the advertisement. *Id.* at 956.

### A.   Defendants' representations[4]

In its complaint, the FTC alleged that defendants made three representations. Having reviewed the twenty-seven advertisements submitted by the FTC in support of its motion, the Court finds that there is no factual dispute as to whether each of the representations appears in the advertisements.

- Defendants' Weight Loss Product causes users to lose substantial amounts of weight rapidly, including as much as 15 to 18 pounds per week and as much as 50% of all excess weight in just 14 days, without dieting or exercising.

In support of its claim that the advertisements made this representation, the FTC cites the following statements in Exhibit 1, which advertises "The New Skinny Pill": "As much as 4 inches and 50% of all excess fat gone in just 14 days!" "Lose up to 15 pounds a week with the amazing formula that forces your body to release fat," "LOSE up to 1 FULL POUND EVERY 8 to 12 HRS, SHRINK DOWN A FULL SIZE SMALLER in just 24 HRS," "You Eat – Miss No Meals – Enjoy all sorts of food, morning, noon and night," and "[The product] works so fast you can actually LOSE as much as 50% OF YOUR EXCESS WEIGHT IN JUST 2 WEEKS," "The Future of Weight Loss is Here, No Calorie Counting . . . No Starvation Diets. You'll feel like a million dollars as you watch your stubborn pockets of excess fat and flab disappear right before your very eyes!" Sabhi Decl., ex. 1. The weight-

---

[3] Defendants do not contest that their weight-loss product constitutes a food or drug within the meaning of the FTCA.

[4] The Court has already rejected defendants' contention that the FTC failed to comply with its discovery obligations. In an order filed March 9, 2009 [Docket No. 66], the Court denied defendants' motion for an order compelling the FTC to produce a second Rule 30(b)(6) witness. The Court reasoned that defendants were not entitled to such an order because (1) non-expert discovery cut-off was November 14, 2008 and defendants gave no reason for waiting until February 24, 2009 to file their discovery request and (2) even though defendants did not file their request until the same day they filed their opposition to plaintiff's summary judgment motion, they did not attempt to comply with the requirements of Federal Rule of Civil Procedure 56(f) in demonstrating their need for a continuance.

1 loss product is advertised to achieve these results through a "medical school caloric abatement formula" that "sheds excess weight." *Id.* The product purportedly works by triggering "a fat-burning chain reaction throughout your entire body." *Id.* Other advertisements expressly claim that defendants' product works "without dieting and without any exercise," *see, e.g.*, *id.*, exs. 3-5, and that the product causes users to "slim down as much as 18 lbs. in a single week," *id.*, ex. 13. The advertisements also represent that these results are attainable for any user by addressing the reader personally and representing that weight loss is caused by a chemical reaction, not by actions taken by the user. In Exhibit 1, for example, the reader is told, "You will see and feel immediate results," "You'll feel like a million dollars," "you owe it to yourself and your loved ones to pick up the phone and call right now." *Id.* Other advertisements are even more explicit that the weight loss is an inevitable result of ingesting the product: "Amazing New Skinny Pill prescription <u>forces</u> your body to release fat, flab and fluid!" *id.* ex. 9, "If you can take two tiny pills per day, you can lose weight . . . ALL the weight you want! – That's all there is to it!" *id.* ex. 12, "Safely Fires Up Slow Metabolism!" *id.* ex. 13, "NEW Slimming Prescription <u>Forces</u> You to Lose Massive Amounts of Weight," *id.* ex. 18, "New Anti-Fat Breakthrough Breaks Genetic Barrier to Losing Weight!," *id.* ex. 22, "New Calorie-Busting Slimming Pill Forces You to Lose Weight Without Diet or Exercise!" *id.* ex. 25.

Taken together, the statements in Exhibit 1 create the net impression that the product causes substantial, rapid weight loss (e.g. up to 15 pounds per week and one pound every 8 to 12 hours) without diet or exercise and that these results are expected for any user. While not all advertisements expressly represent that users need not diet or exercise, they do represent that the weight loss is achieved through a "caloric abatement formula" that causes fat to "melt away." *Id.*, ex. 1. In addition, the product is marketed as a "skinny pill," i.e. a *pill* that, irrespective of diet or exercise regimen, will make the user lose weight.

Defendants' attempts to create a factual dispute on this issue are unavailing. Defendants cite the statement that appears in minuscule type at the bottom of the advertisements and includes the following qualifications: "Results will vary from one individual to another . . . . To achieve best results, you should follow the caloric abatement recommendations, increase activity level and not rely on pill use alone." *See, e.g.*, *id.*, ex. 1. Defendants cannot innoculate themselves from the representations that

7

appear in the body of the text by including these cautionary statements at the foot of the advertisements. *See Cyberspace.Com*, 453 F.3d at 1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."). The statements that defendants cite do not correct the message of the advertisements, which is, overwhelmingly, that *any* user of this product can lose lots of weight quickly by taking a pill and doing nothing else.

Moreover, even if the Court accepts defendants' premise that defendants did not expressly represent that their product causes rapid, substantial weight loss without diet or exercise, there is still no factual dispute on this issue. According to defendants, because the representations are not express, the FTC's motion must be denied because it fails to present "extrinsic evidence" in order to prove that the representations are implied. (In the context of false and deceptive advertising, extrinsic evidence refers to survey data on how consumers perceive an advertisement. *See, e.g.*, *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 40 (D.C. Cir. 1985)). This argument fails for at least two reasons. First, the cases defendants cite in support of the proposition that the FTC is always required to present extrinsic evidence in an implied representation case came to the opposite conclusion. *See, e.g.*, *Brown & Williamson*, 778 F.2d at 40 ("we do not accept appellant's contention that consumer survey evidence must, as a matter of law, be presented to support a finding that an advertisement has a tendency to deceive); *Kraft, Inc. v. FTC*, 970 F.2d 311, 319 (7th Cir. 1992) ("While Kraft's arguments may have some force as a matter of policy, they are unavailing as a matter of law. Courts, including the Supreme Court, have uniformly rejected imposing . . . a requirement [to present consumer survey evidence] on the FTC, [citation] and we decline to do so as well."); *see also Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1146 n.11 (9th Cir. 1978) ("Consumer testimony, although sometimes helpful, is not essential" to determining whether advertisements have the capacity to deceive or mislead).

Second, even if the representations were implied, these advertisements are capable of only one interpretation. The FTC does not need to present consumer survey data in order to prove what is obvious to any rational reader: these advertisements represent that defendants' product achieves dramatic weight loss for anyone without the discomfort of diet and exercise.

- Defendants' Weight Loss Product causes permanent or long-term weight loss.

The FTC contends that there is no factual dispute as to whether the advertisements represent that the weight loss product causes permanent or long-term weight loss. The advertisement in Exhibit 1 claims, "you have only pounds and inches to lose and a lifetime of slimness to gain." Sabhi Decl., ex. 1. In addition, it states, "FINALLY, YOU ARE ON YOUR WAY TO A LIFETIME OF SLIMNESS." The product also promises readers that this is an "important opportunity to finally win your war against fat and escape the guilt of past failures . . . ." Finally, readers are told, "this is the LAST WEIGHT REDUCING AD YOU WILL EVER HAVE TO READ!" In a different advertisement, the bold-face headline reads "Weight Loss Breakthrough . . . Never Diet Again!" and the subtitle states, "Forget About Dieting . . . Period!" Sabhi Decl., ex. 16. The Court agrees that these statements unambiguously represent that defendants' product causes permanent or long-term weight loss.

Defendants raise two arguments in response, both of which fail. First, defendants contend that the statements simply offer "encouragement" and do not represent that the product causes permanent weight loss. The Court disagrees. The statements inform readers that if they use defendants' products, they will they will not have to diet in the future. The only reasonable interpretation is that future dieting is unnecessary because weight loss from the product will be permanent. In addition, some of the advertisements expressly state that the weight loss will be permanent: "Forget about Dieting . . . Period! From Now On the Only Things You'll Ever Count Are the Pounds and Inches You Lose! Guaranteed!", *id.* exs. 16-17. Defendants' statements exceed mere encouragement; they make representations about the lasting effect of the product.

Second, defendants point out that they also offered "a no questions asked, unconditional refund." *Id.*, ex. 1. This offer does not change the representations in the advertisements and therefore does not affect the Court's conclusion that defendants unambiguously represented that weight loss would be permanent.

- Clinical studies prove that Defendants' Weight Loss Product causes users to lose substantial amounts of weight rapidly, including as much as 15 to 18 pounds per week and 50% of all excess weight in just 14 days, without dieting or exercising.

The FTC argues that there is no factual dispute that as to whether the advertisements represented that the effects discussed above – rapid, substantial weight loss without diet or exercise – were

9

1  supported through clinical studies. The Court agrees. The advertisement in Exhibit 1 claims that the
2  product was "[d]eveloped at a prestigious European university," that it uses a "medical school" formula,
3  and that it is a "doctor designed therapy." Sabhi Decl., ex. 1. The statements all create the impression
4  that there is some scientific basis for the claims in the advertisement. More directly, the advertisement
5  also states: "Fast, Immediate Results . . . Guaranteed! Clinical studies prove it." *Id.* Defendants do not
6  appear to contest that the advertisements represent that the promised results are supported by clinical
7  studies.

8  Accordingly, the Court finds that there is no triable issue as to whether defendants'
9  advertisements made the three representations alleged in the complaint.

### B. Likelihood of misleading consumers

The Court next turns to the question of whether there is a factual dispute as to whether the representations are "likely to mislead consumers acting reasonably under the circumstances . . . ." *Gill*, 265 F.3d at 950. The FTC can prove that a representation is likely to mislead consumers in either of two ways. "First, the government can assert a so-called 'falsity' theory. To prevail on such a theory, the government must carry the burden of proving that the express or implied message conveyed by the ad is false. Alternatively, the government can rely on a so-called 'reasonable basis' theory. To prevail on this theory, the government must show that the advertiser lacked a reasonable basis for asserting that the message was true." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994) (internal citations omitted).

Here, the FTC relies on the expert opinion of Edward R. Blonz to prove that the representations are false. According to Blonz, the claims made in the advertisements are "clearly outside the realm of plausible science." Rose Decl., ex. 1000 ¶ 32(d). He also examined the scientific literature on the active ingredients in defendants' product and concluded that there is no evidence that these ingredients, as provided through defendants' product, could achieve substantial, rapid and permanent weight loss. *Id.* ¶¶ 18-20. Finally, Blonz did not find any published, peer-reviewed clinical study testing defendants' product or the combination of ingredients contained in the product. *Id.* ¶ 5.

Defendants attempt to create a factual dispute on the falsity of the representations through the

report of Lawrence J. Cheskin, M.D., who was properly noticed as a rebuttal expert. Cheskin opines that Citrus Aurantium has "the same mechanism of action as ephedra compounds, and very similar effects on sympathetic nervous system activity." *See* Decl. of Andrew B. Lustigman in Supp. of Defs. Opp., ex. A ¶ 3.2.2. In addition, he states, "I believe it is a reasonable clinical inference that [defendants'] product will have effects comparable to the demonstrated effects on body weight of the caffeine-ephedra combination, i.e. that weight can be lost in excess of control, independently of differences in dieting and exercise." *Id.* ¶ 3.3. It is also his opinion that "[w]hile unusual, weight loss of this magnitude [i.e. losing 15-18 pounds in a week] is quite possible," *id.* ¶ 3.10, and that "weight loss of as much as 50% of this (5-10 pounds) is quite reasonable to lose in 14 days, especially in light of the well-known diuresis that occurs in the early stages of dieting," *id.* ¶ 3.11.

The Court finds that Cheskin's testimony does not create a factual dispute on whether the representations in the advertisements are false. Cheskin does not opine that clinical studies supported the advertised results at the time the advertisements ran, and he also does not suggest that weight loss can ever be permanent or that the specific results (5-10 pounds in 14 days, or 15-18 pounds in a week) would be attainable for the average user. Moreover, Cheskin testified at deposition that if a user took the product without dieting and exercising, "they certainly wouldn't lose 15 or 18 pounds," *see* Sabhi Decl., ex 34, 97:11-12, and that such a claim is "not substantiated," *id.* 114:10-13.

Defendants also argue that they had a reasonable basis for asserting that these representations are true. Having failed to put forth evidence establishing the existence of a factual dispute on the falsity of the representations, defendants cannot avoid summary judgment by arguing that they had a reasonable basis for making the representations. In any event, defendants fail to introduce admissible evidence in support of their "reasonable basis" claim. First, defendants cite a study that was apparently commissioned by defendant Scott Holmes in 2004 and published in the *Journal of Obesity*. *See* Decl. of Scott Holmes in Supp. of Defs. Opp. ("Holmes Decl."), ex. A. This study, however, concerned a product containing ephedra that defendants marketed before selling the product that is the subject of this dispute. Thus, the *Journal of Obesity* study does not support defendants' claim that clinical studies showed the results represented in their advertisements.

Second, defendants cite a report by a Dr. David Allison, a professor of biostatistics at the

11

University of Alabama, in which Allison opined that Citrus Aurantium is a "promising supplement" for weight loss. *Id.*, ex. A at 559. Defendants did not notice Allison as an expert, as required by Federal Rule of Civil Procedure 26(a)(2). Allison's expert report is therefore not admissible and cannot be considered in support of defendants' opposition. In addition, Allison's report is not signed, as required by Rule 26(a)(2)(B). Even if the Court could consider Allison's report, his opinion that Citrus Aurantium can be substituted for ephedra does not establish that defendants had a reasonable basis for representing that clinical studies have proven that their product could cause rapid, substantial, and permanent weight loss without diet or exercise.

Third, defendants rely on what purports to be a letter by a Dr. Glen Halvorson in which he advised Holmes that defendants' product "had been shown to cause weight loss without dieting and without exercise." Holmes Decl. ¶ 5. The Court cannot consider this letter because it is undated and defendants provide no basis for authenticating it. Again, however, even if this document were admissible, it would not constitute evidence that defendants had a reasonable basis for the representations. Halvorson's analysis considers the effects on obese users and thus does not establish that the promised results can be achieved in *any* user. *See* Holmes Decl., ex. D at p.4. The purported letter from Halvorson also fails to state that clinical studies prove these results or that weight loss from the product is permanent. *Id.* In fact, Halvorson reads the advertisements to state that exercise and behavior modification are "critical to long term success." *Id.* at p.5. As discussed above, the overall message of the advertisements is the product achieves weight loss without diet or exercise.

Fourth, defendants point to what they claim is a study of defendants' product conducted by a Brazos G. Minshew. Once again, Minshew's expert opinion is inadmissible because defendants did not notice him as an expert. In addition, the study is undated and unpublished and defendants offer no means of authenticating it. The study consisted of following 28 overweight or obese individuals for four weeks. Nine of the subjects did not engage in "lifestyle modification," i.e. diet and exercise. At the end of four weeks, total weight loss in the subjects who did not engage in lifestyle modification was 4.3 kg (9.5 lbs). Thus, even if the study were admissible and its results were scientifically reliable, it would be evidence only that nine people who did not diet or exercise lost, on average, about 2.4 pounds a week for four weeks.

Accordingly, the Court finds that there is no triable issue as to whether the representations are false and therefore likely to mislead consumers.

### C. Materiality

Finally, the Court considers whether the representations were material. *See Gill*, 265 F.3d at 950. "A misleading impression created by a solicitation is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.Com*, 453 F.3d at 1201 (internal citation omitted). The FTC contends that the representations here are material because "they concern critical information intended to affect consumers' choice to purchase" defendants' product. Pl. Mot. for Summ. J., at 20. Defendants do not dispute this characterization of the representations or offer any evidence suggesting that the representations are not material. Accordingly, the Court finds that there is no factual dispute as to the materiality of these representations.

In sum, there is no triable issue as to whether defendants violated the FTCA by advertising their product with material representations that are false and therefore likely to mislead consumers.

### 2. Individual Liability

The FTC contends that there is no factual dispute as to whether Scott Holmes is individually liable for the FTCA violations of the corporate defendants. "[A]n individual may be subject to injunctive relief if the FTC can prove that an individual participated directly in the acts in question or had authority to control them. . . . . [T]o hold an individual liable for restitution, the FTC must also show that the individual had actual knowledge of the material misrepresentations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." *FTC v. Garvey*, 383 F.3d 891, 900 (9th Cir. 2004) (internal citations omitted). *See also Pantron I Corp.*, 33 F.3d at 1104 (holding that individual defendant was personally liable for monetary relief because "[g]iven the overwhelming evidence that no scientific support existed for the product's efficacy claims, [defendant] could not have failed to know that the scientific support claims were false unless he intentionally avoided the truth.").

Here, defendants do not dispute that Holmes was responsible for writing and placing the advertisements and researching the ingredients contained in the product. They claim, however, that he cannot be held personally liable because he had a good faith belief in the efficacy of his product. The Ninth Circuit's decision in *FTC v. Garvey* is instructive on this issue. 383 F.3d 891 (9th Cir. 2004). In *Garvey*, the defendants hired Steven Garvey, a retired first baseman for the Los Angeles Dodgers, to film an infomercial promoting defendants' weight loss product. About four months before filing the infomercial, Garvey and his wife began using the product and lost eight and twenty-seven pounds, respectively. Garvey also received booklets from defendants that purported to give the results of scientific findings on the products. *Id.* at 894. On these facts, the Ninth Circuit held that the FTC had failed to show that Garvey had the requisite mental state to sustain participant liability. *Id.* at 902.

The instant case is obviously distinguishable. Holmes was deeply involved in designing the composition of the products and composing the representations at issue here. His claim that he took "responsible steps" to substantiate the claims in the advertisements is unavailing in light of the lack of evidence that the representations in his advertisements are scientifically possible or supported by clinical studies. Moreover, Holmes admits that by March of 2006, he was aware that the FTC had initiated a "red flag" campaign warning of the "bogus" claims in defendants' advertisements. Sabhi Decl., exs. 36, 37; Rose Decl., ex. 2 (Interrog. Response No. 4). Nonetheless, in January of 2007, he placed another set of advertisements. *Id.* ex. 28. Holmes' claims that he personally lost weight using his product does not create a factual dispute on this issue. He attests that he lost "at least 18 pounds" when he took his product for 30 days in late 2005. Holmes Decl. ¶ 9. Holmes does not, however, contend that this weight loss was permanent, that he lost the weight without dieting or exercising, or that there were clinical studies showing that this result could be expected in any user. His personal experience with weight loss therefore has no bearing on whether he held a good faith belief that the representations in his advertisements were substantiated. For these reasons, the Court finds that Holmes has failed to put forth any evidence creating a genuine factual dispute on the issue of his individual liability for restitution.

Holmes' claim that he acted pursuant to a good faith belief in the efficacy of his product does not allow him to escape injunctive relief, either. "Permanent injunctive relief is appropriate when there is a some cognizable danger of recurring violation." *FTC v. Medical Billers Network, Inc.*, 543 F. Supp.

14

2d 283, 323 (S.D.N.Y. 2008) (citation omitted). Holmes does not dispute that he continued to run his advertisements after learning of the FTC's warnings about his product. He offers no evidence to rebut the FTC's claim that he is likely to continue this conduct; his declaration reveals that he continues to believe he substantiated the claims in his advertisements adequately. Holmes Decl. ¶ 12.

Accordingly, the Court finds that there is no factual dispute that (1) Holmes was, at the very least, recklessly indifferent to the falsity of his representations and therefore may be held personally liable for restitution and (2) there is a cognizable danger that he will persist in these violations and therefore is subject to injunctive relief.

### 3.     Corporate Liability

Defendants do not contest that Medlab, Metabolic, and U.S.A. Health are liable for advertisements they placed in violation of the FTCA. They do, however, contend that the FTC is not entitled to summary judgment on the issue of whether Pinnacle Holdings, Inc. ("Pinnacle") is also liable. Defendants cite Holmes' declaration, in which he attests that Pinnacle "merely placed the advertising" with newspaper insert publishers and did not "engage in the advertising at issue." Holmes Decl. ¶ 13. Defendants' distinction between "placing" advertising and "engaging" in advertising is not evident to the Court. Section 12 of the FTCA "prohibits the dissemination of 'any false advertisement' in order to induce the purchase of 'food, drugs, devices, or cosmetics.'" *Pantron I Corp.*, 33 F.3d at 1095 (citing 15 U.S.C. § 52(a)(2)). Thus, Pinnacle violated the FTCA if it disseminated the advertising at issue here, which Holmes admits it did.

### 4.     Scope of relief

Defendants raise two issues relating to the scope of the relief the FTC seeks. First, defendants contend that the FTC's "arbitrary and capricious" enforcement precludes it from seeking equitable relief. The FTC's enforcement is arbitrary and capricious, defendants argue, because the agency has chosen not to pursue claims against News America, one of the companies that placed defendants' advertisements in its newspaper inserts. The FTC "alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds

15

and personnel in such a way as to execute its policy efficiently and economically." *FTC v. Universal-Rundle Corp.*, 387 U.S. 244, 251 (1967) (citation omitted). Defendants cite no evidence that would allow the Court to question the enforcement decisions made by the FTC in this case.

Second, defendants argue that the FTC is not entitled to "financially obliterate" defendants. The FTC seeks judgment in the amount of $2,693,256, which is the amount of gross sales (minus refunds) of defendants' weight loss product. Sabhi Decl. ¶ 25. Defendants contend that all legitimate business expenses should be subtracted from this sum. The Ninth Circuit recently held that in a case brought under the FTCA, a district court may award "the full amount lost by consumers rather than limiting damages to a defendant's profits." *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009).[5] Accordingly, in light of all the circumstances of this case, the Court finds that the correct measure of equitable relief in this case is defendants' gross sales, minus the amount already refunded to customers. Defendants do not contest that this sum amounts to $2,693,256.

### 5.     **Form of Final Judgment/Permanent Injunction**

The Court has reviewed the "[Proposed] Final Judgment and Order for Permanent Injunction and Other Equitable Relief as to All Defendants," submitted by plaintiff. The Court finds it appropriate in form and content, and will execute it unless defendants show, no later than April 28, 2009, why any of its provisions would be improper or unduly onerous.

---

[5] The Court recognizes that the Ninth Circuit's decision appears to conflict with decisions of the Second and Seventh Circuits. *FTC v. QT, Inc.*, 512 F.3d 858, 863 (7th Cir. 2008); (appropriate remedy is disgorgement of profits); *FTC v. Verity Intern., Ltd.*, 443 F.3d 48, 66 (2d Cir. 2006) ("The district court measured the appropriate amount of restitution as 'the full amount lost by consumers.' This was error. The appropriate measure for restitution is the benefit unjustly received by the defendants."). *Stefanchik* is nonetheless binding on this Court.

16

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS the FTC's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: April 21, 2009

SUSAN ILLSTON
United States District Judge